UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LEE ARTHUR RICE, II, an individual,<br><br>    Plaintiff,<br><br>    v.<br><br>JANET MURAKAMI, DALE MOREHOUSE, JEFFREY A. HILL, TONY FORD, MARK ABERCROMBIE, NICK SHAFFER, and JOHN DOES 1-20,<br><br>    Defendants. | Case No. 1:13-cv-00441-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Before the Court is a motion for summary judgment filed by Officers Dale Morehouse and Nick Shaffer. The motion is fully briefed and at issue. For the reasons set forth below, the Court will grant the motion in part.

## SUMMARY

When the police encounter a serious danger, they are often required to use aggressive force. One technique used by officers to subdue a dangerous suspect is the take-down maneuver. By taking a dangerous suspect to the ground – quickly and aggressively – the officers control the danger, ensure the safety of all involved, and prevent an escalation of force that might result in greater injury to the suspect. Because this maneuver constitutes an aggressive use of force, it is not warranted in every

circumstance. But where a reasonable officer would conclude that the suspect presents a serious and immediate danger to the safety of themselves and others, the take-down maneuver is not an excessive use of force.

In this case, Officers Morehouse and Shaffer used the take-down maneuver to take plaintiff Rice to the ground. At the time, the officers were responding to a Code 3 alert, which is the most urgent of alerts and signals that an officer is in a life-or-death situation. The officers had no time to verify the accuracy of the Code 3 alert. Rice was larger than the officers, protesting in a loud and angry voice, and had not been frisked for weapons. Even though he was not resisting arrest, the officers were entitled to use the take-down maneuver on Rice under these circumstances, and thus cannot be held liable for the use of excessive force for that maneuver. Even if it is now deemed that the maneuver constitutes excessive force, the officers are entitled to qualified immunity because it was not clearly established in the law at the time of the incident that such force was excessive.

After Rice was taken to the ground, he alleges that although he was not resisting in any manner, a number of officers assaulted him causing permanent injury. In a prior decision, the Court held that a dash-cam video of this scrum did not clearly refute Rice's allegations. If Rice was passive, and restrained by a number of officers on the ground, any assault by the officers causing permanent injury could constitute excessive force. Those officers would not be entitled to qualified immunity because it was clearly established in the law that such an assault would be excessive force, and the assault would have constituted a constitutional violation.

With these rulings, only two claims remain in this case: (1) a claim against Officer Murakami for calling in the Code 3 alert; and (2) a claim against Officers Hill, Ford, Abercrombie, Morehouse and Shaffer that they used excessive force against Rice during the scrum as Rice was restrained on the ground.

**FACTS**

On December 26, 2011, at approximately 3:30 AM, Idaho State Trooper Janet Murakami followed plaintiff Lee Arthur Rice's vehicle while he was driving with his family on I-84. Her dash-cam video shows Rice signal to move to the left lane and then, about two or three seconds later, move into that left lane. Officer Murakami switched lanes herself to continue following Rice. Rice traveled in that lane for a few minutes, and then drifted over to the right lane about the same time he put on his right blinker. Officer Murakami turned on her flashing lights and pulled Rice over. Rice immediately complied, and both vehicles stopped on the far right emergency lane.

Officer Murakami approached the vehicle, and asked to see Rice's driver's license several times. Rice responded by asking to speak with Officer Murakami's supervisor, verbally identifying himself to Officer Murakami, and showing Officer Murakami his license through the window. Unsatisfied with Rice's response, Officer Murakami contacted dispatch for Code 3 assistance. A Code 3 dispatch is to be reserved for life and death emergency calls. *See Memorandum Decision (Dkt. No. 86) at pp. 3-4; see also*

*Code 3 Police Response Changes* (stating that "[a] Code 3 response from police needs to be reserved for life and death emergency calls").[1] Officers are informed that a Code 3 dispatch requires an emergency response with lights and sirens utilized from responding officers. *Shaffer Affidavit (Dkt. No. 80-4)* at ¶ 2. This is the "most urgent" of all calls for assistance. *See Haug Affidavit (Dkt. No. 80-6)* at ¶ 5.

Before assistance arrived, Officer Murakami approached Rice's vehicle and informed him that if he did not produce his license or exit his vehicle then she would place him under arrest for obstruction. Rice remained in his vehicle and continued to ask to speak with Officer Murakami's supervisor. Officer Murakami then placed Rice under verbal arrest and informed Rice that she and the responding officers would remove Rice from the vehicle by force if he did not comply.

Ada County Sheriff's Officers Morehouse and Shaffer were among the first of the seventeen officers to arrive on the scene, arriving within minutes of Officer Murakami's call for Code 3 assistance. Officers Murakami and Morehouse approached the driver's side door followed by a third officer whose back is to the dash-cam, obscuring the view of what is occurring. The video does show that the driver's door opens, and that Officers Murakami and Morehouse appear to be pulling Rice out of the car. Officer Morehouse alleges that he took hold of Rice's right arm and that Officer Murakami took hold of his

---

[1] News Release, Chief of Police William L. Bones, Boise Police Dep't (Feb. 3, 2009) http://police.cityofboise.org/home/news-releases/2009/02/02-03-09-code-3-police-response-changes/.

left. *See Morehouse Affidavit (Dkt. No. 80-3)* at ¶ 9-10. This allegation is not refuted by Rice and the Court will therefore assume its truth.

The third officer then starts walking backward. Behind him, one can see glimpses of activity as Rice continues to protest loudly. That activity might be a struggle or just the officers positioning themselves in tight quarters – it is not clear because the third officer continues to block the view of the dash-cam. Thus, at this point, the video does not conclusively refute Rice's claim that he was not resisting the officers. *See Rice Declaration, supra* at ¶ 10 (stating that "I walked to the rear of the car and still was not resisting in any way").

As the third officer continues to walk backward, he steps aside, revealing that Officer Murakami has lost her hold on Rice and is stumbling backwards, obviously off balance. The video does not reveal why she lost her balance.

As Officer Murakami stumbles backward, and loses her grip on Rice, his left arm is free. Rice is now being held only by Officer Morehouse, and as the two of them approach the back of the car, Officer Shaffer steps in to grab Rice's left arm. Immediately, both officers stick their legs out to trip Rice and take him down to the ground. *Shaffer Affidavit (Dkt. No. 80-4)* at ¶ 10.

Rice alleges that "[o]nce I was on the ground, the numerous officers . . . repeatedly struck and kneed me in the torso, hops and back . . . [and] wrenched my arms, shoulders, and twisted by fingers." *See Rice Declaration, supra* at ¶ 13. The video shows Officer Morehouse kneeling next to Rice, with his side and then his back to the dash-cam. It

appears he is holding Rice down, but his body, and the scrum of other officers, obstructs any view of what they are doing to Rice. Officer Shaffer is on the other side of Rice but is almost entirely blocked from view by the bodies of other officers.

The Court discussed this scrum in more detail in its prior decision, and will not repeat that discussion here. *See Memorandum Decision (Dkt. No. 86)* at p. 4-5, 15-20. It is enough to say, as the Court did in that decision, that although Rice can be heard protesting loudly, the video does not conclusively refute his claim that he was physically passive and not resisting while the officers held him down and handcuffed him. *Rice Declaration (Dkt. No. 51-1)* at ¶ 14.

After Rice was handcuffed, Officer Morehouse performed a search of Rice's person, removed various items from Rice's pockets, and placed those items on the trunk of Rice's vehicle. Officer Morehouse then asked Officer Murakami to take possession of the items. *Morehouse Aff.*, Dkt. 80-3, ¶ 15. Neither Officer Morehouse nor Officer Shaffer searched Rice's vehicle. Rice claims to have suffered long-term physical injuries to his back, hips, knees and emotional and mental distress due to the arrest. *Rice Declaration (Dkt. No. 51-1)* at ¶ 24.

**PROCEDURAL BACKGROUND**

Rice brought suit under 42 U.S.C. § 1983 against Officer Murakami and the seventeen other responding officers, including Officers Morehouse and Shaffer who have filed the motion now before the Court. Rice alleges several constitutional violations: deprivation of liberty without due process of law; deprivation of property without due

process of law; taking of property without just compensation; unreasonable search and seizure; false arrest; excessive force during arrest; excessive force while a pre-trial detainee; and denial of timely assistance of defense counsel. To date, the Court has dismissed twelve named defendants. *See Orders (Dkt. Nos. 38, 42 & 75).* Currently, six named defendants remain in the action: Officers Murakami, Hill, Ford, Abercrombie, Morehouse, and Shaffer.

The first four of those remaining officers – Officers Murakami, Hill, Ford, and Abercrombie – previously filed a motion for summary judgment. The Court granted that motion in large part, dismissing every claim against these officers except the claim of excessive force. *See Memorandum Decision (Dkt. No. 86).* Those officers were involved in the scrum after the take-down, and so the Court's opinion only evaluated the scrum rather than the take-down. The Court held that the video did not conclusively refute Rice's assertion that he was passive during the scrum and yet was physically assaulted by the Officers leading to permanent injuries. Because the video did not conclusively refute Rice's allegations, the Court had to accept those allegations as true. This created sufficient questions of fact on whether the Officers used excessive force during the scrum to warrant denying their motion for summary judgment as to that issue. The Court granted summary judgment on all other claims against the Officers.

The Court now has before it a motion for summary judgment filed by Officers Morehouse and Shaffer, who were involved in both the take-down and the scrum. The Court will examine each argument of their motion.

# ANALYSIS

## Excessive Force

Rice's complaint alleged that the officers used excessive force to (1) pull him from the car; (2) take him down to the ground; and (3) hold him down and handcuff him. The Court has ruled on the first and third of these. *See Memorandum Decision (Dkt. No. 86).* With regard to the first claim – that the officers used excessive force in pulling Rice from the car – the Court found the force was minimal and necessary to effectuate the arrest of Rice. *Id.*

With regard to the third claim – that the officers assaulted Rice as they restrained and handcuffed him despite his passive behavior – the Court held that Officer Murakami's handcuffing of Rice did not constitute excessive force. With regard to the other officers' conduct during the scrum, the Court held that the video did not conclusively (1) refute Rice's allegations or (2) reveal the conduct of the officers. The parties told dramatically different versions of what happened while Rice was restrained and handcuffed. Thus, questions of fact exist concerning what happened during the "scrum" – that is, the restraint and handcuffing of Rice. The Court therefore denied summary judgment for the officers involved in the scrum, other than Officer Murakami. *See Memorandum Decision (Dkt. No. 86).*

The Court is now asked to determine whether the second of the three allegations of excessive force – the take-down of Rice – constituted excessive force. To answer that question, the Court must first review the legal standards governing excessive force cases.

In evaluating a Fourth Amendment claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Reasonableness therefore must be judged from the perspective of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." *Id*. at 396.

The Ninth Circuit summarizes this analysis in three steps. *Glenn v. Washington County,* 673 F.3d 864, 871 (9th Cir. 2011). First, the Court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." Even "where some force is justified, the amount actually used may be excessive." *Id.* Second, the Court must evaluate the government's interest in the use of force. *Id.* Finally, the Court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* Because the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary

judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id.*

Turning first to the type and amount of force inflicted, there is substantial force involved in tripping and taking someone down to the ground. Rice said he was "forcibly" thrown to the ground, face first on the pavement." *See Rice Declaration, supra* at ¶ 12.

Balancing that force against the need for that force requires evaluation of a number of factors. First and foremost is the fact that Officers Morehouse and Shaffer were responding to a Code 3 life-or-death alert and had no time to independently determine if the alert was legitimate. They had to assume that Rice posed a serious danger to the officers, and consequently they were entitled to treat him aggressively, even assuming he was not physically resisting. *Compare Deorle v. Rutherford,* 272 F.3d 1272 (9th Cir. 2001) (finding that officer responding to Code 3 alert had sufficient time to observe that suspect did not pose a serious risk). Rice was larger than they were, and was protesting in a loud and angry voice. The officers could see that Rice had not been frisked for weapons.

Police officers who encounter a seriously dangerous suspect who is protesting in a loud and angry manner and has not been frisked for weapons are trained to control him with a take-down maneuver. *See Haug Affidavit (Dkt. No. 80-6)* at ¶ 18. The maneuver is designed to protect the officers and minimize any violence, at least in part by preventing the suspect from fighting back and eliciting an even more harmful response from the officers. *Id.* (stating that "takedowns thus carry the benefit of being low risk-of-

injury arrest techniques, while at the same time retaining a high effectiveness rate in gaining compliance over difficult subjects"). The goal is to gain control "as quickly as possible while still posing a low-injury risk to all involved." *Id.* at ¶ 19. As the Circuit noted in *Deorle,* "a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end." *Id.* at 1283.

Here, the defense expert in police arrest techniques, Scott Haug, testified that Officers Morehouse and Shaffer "effectuated [the takedown] properly" as they are "taught in basic law enforcement training." *Id.* at ¶¶ 17, 20.[2] Rice did not respond to Haug's statements and thus they are unrebutted in the record. The Court therefore assumes that the officers executed their take-down maneuver on Rice in a manner consistent with their training. *Columbia Pictures Industries, Inc. v. Fung,* 2009 WL 6355911 (C.D.Cal. 2009) (accepting expert opinion proffered by moving party in summary judgment proceeding when it was unrebutted by non-moving party).

While a take-down maneuver is undoubtedly an aggressive use of force, the officers were entitled to assume that Rice posed a serious danger and needed to be controlled with aggressive force like the take-down maneuver. Thus, in balancing the

---

[2] Scot Haug is the Chief of Police for the Post Falls Police Department. *See Haug Affidavit (Dkt. No. 80-6).* He holds Peace Officers Standards and Training (POST) Advanced, Supervisory, and Management certificates and has been a POST instructor since 1992, teaching officers the proper use of force. *Id.* He was a member of the POST committee that developed the standardized Idaho Arrest Techniques and Handcuffing Curriculum manual for the State of Idaho. *Id.* His affidavit establishes his expertise to testify regarding the take-down maneuver employed by Officers Morehouse and Shaffer. Rice did not respond to this testimony and so it is unrebutted in the record.

force employed against the need for that force, the Court finds as a matter of law that the take-down maneuver used by Officers Morehouse and Shaffer did not constitute excessive force as a matter of law.

But even if it did, the officers have qualified immunity. Qualified immunity operates to protect officers from the sometimes "hazy border between excessive and acceptable force," and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. *Brosseau v. Haugen,* 543 U.S. 194, 201 (2004). "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation." *Id.* at 599.

The law at the time was not clearly established. The parties cite no case where a take-down maneuver under the circumstances faced here – where officers are responding to a Code 3 alert without time to verify the accuracy of the alert – had been found to constitute excessive force. Thus, even if the maneuver is now deemed to constitute excessive force, it would not have been clear to a reasonable officer at the time he used the take-down maneuver on Rice that his conduct was unlawful.

For all these reasons, the Court finds that Officers Morehouse and Shaffer have qualified immunity for their conduct in executing the take-down maneuver on Rice.

**The Scrum**

Officers Morehouse and Shaffer also argue that their conduct during the scrum did not constitute excessive force, and that even if it did, they are entitled to qualified

immunity for their actions. The Court disagrees for the same reasons it set forth in its earlier decision. *See Memorandum Decision (Dkt. No. 86).* The Court must assume that Rice was passive and was assaulted by the restraining officers during the scrum. The video of the scrum does not conclusively refute Rice's allegations. If Rice was passive during the time he was being restrained on the ground by multiple officers, there was no governmental need at that point to assault him. Thus, the Court cannot find a lack of excessive force as a matter of law.

Moreover, the officers would not be entitled to qualified immunity because the law was clear under those circumstances that an assault would constitute excessive force. *Santos v. Gates,* 287 F.3d 846, 854-55 (9th Cir. 2002) (holding that summary judgment for officer was improper when officer injured a suspect who was "passive" and presented no "safety risk"). This was not a "hazy" area like that found in the discussion of the take-down maneuver above. *Brosseau,* 543 U.S. at 201. Thus, the Court denies the officers' motion to the extent it seeks summary judgment on Rice's claim that they used excessive force on him during the scrum.

### All Other Claims

Rice makes a host of other claims against Officers Morehouse and Shaffer. Many of them fall for the same reasons set forth in the Court's earlier decision. Others fall because Rice failed to carry his burden of coming forward with some evidence to rebut the claims of the officers that he had no evidence. The Court will therefore grant

summary judgment on all claims against Officers Morehouse and Shaffer except for the claim that they used excessive force against Rice during the scrum.

**Conclusion**

The Court finds as a matter of law that the take-down maneuver executed by Officers Morehouse and Shaffer did not constitute excessive force, and that if it did, the officers are entitled to qualified immunity from suit for any injuries Rice may have suffered as a result of that take-down. With that ruling, only two claims remain in this case: (1) a claim against Officer Murakami for calling in the Code 3 alert; and (2) a claim against Officers Hill, Ford, Abercrombie, Morehouse and Shaffer that they used excessive force against Rice during the scrum as Rice was restrained on the ground.[3]

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for summary judgment filed by Officers Morehouse and Shaffer (docket no. 80) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent it seeks to dismiss all claims except the claim of excessive force during the scrum when Rice was restrained on the ground and handcuffed.

---

[3] In the Court's prior decision, the Court held that Officer Murakami's only involvement in the scrum was to place handcuffs on Rice, an action that the Court held did not constitute excessive force. Thus, the only remaining claim against Officer Murakami is for her calling in the Code 3 alert.



DATED: April 16, 2015

_____
B. Lynn Winmill
Chief Judge
United States District Court

**MEMORANDUM DECISION AND ORDER - 15**